Zobel, J.
I make the following findings by a preponderance of the credible evidence and the reasonable inferences to be drawn therefrom.
1. Plaintiff James Clegg was injured in an automobile accident (“the accident”) May 4, 1991 at Woburn, Massachusetts.
2. Plaintiff is, and at all material times was, married to Catherine; he is the father of two minor children, Erin and Rachael.
3. At the time of the accident plaintiff, 39, was employed by the Boston Edison Company and by White Hen Pantry. He had earned $40,259.93 in 1990 from the Boston Edison Company as a Grade A mechanic. He also earned $80.00 weekly from White Hen Pantry as a night manager one or two nights per week. On his 1990 federal income tax return he reported total earnings of about $41,000.00.
4. The accident occurred solely as a result of the negligence of defendant Jeffrey L. Butler, insured by defendant Utica Mutual Insurance Co. (“Utica”) with coverage of $250,000.00 per person/$500,000.00 per accident. Butler was also covered by an excess limits or “umbrella” policy issued by the Merrimack Mutual Insurance Company (“Merrimack”) providing indemnity up to $1,000,000.00.
5. Having investigated the circumstances of the accident immediately upon notification of the accident and plaintiffs claim, Utica determined in May 1991, that its insured was clearly liable. The Utica adjuster, Jerome Zeidman, and his supervisor, John Petrosius, shared this view. Although the record contains evidence to the contrary, I do not credit it.
6. At no time did Utica possess any credible information that indicated that plaintiff caused or contributed to the accident in any way. At no time did Utica consider the case to be anything but a so-called 100% liability case against its insured.
7. Plaintiff, as Utica knew no later than May 8, 1991, was represented by Attorney Marvin H. Green-berg of Woburn, Massachusetts.
8. Plaintiffs medical and hospital records abundantly document serious musculoskeletal and neurological injuries proximately caused by the accident.
9. Utica retained Dr. Robert Swiggert, Jr., an orthopedic specialist, to perform an independent medical examination (“IME”) on Plaintiff in June 1991. At that time, Dr. Swiggert lacked any medical information relating to plaintiffs care and treatment.
10. Petrosius considered the IME “nothelpful,” and, because Dr. Swiggert had no medical information to review, an inaccurate assessment of plaintiffs injuries.
11. In July 1991, Zeidman retained Peter Cavanaugh to perform an activity check and surveillance on plaintiff. Zeidman did not tell Cavanaugh that plaintiff was represented by an attorney.
12. Cavanaugh interviewed plaintiff, although Utica’s standards for investigation of claims proscribed interviewing a represented claimant. The investigation revealed plaintiff to have been severely injured. Cavanaugh reported to Utica that plaintiff might never return to work. He also reported that the injuries appeared severe, and suggested that Utica check its reserves, i.e., that it reevaluate the case.
13. At no time after June 1991, did Utica obtain another IME of plaintiff, although the evidence permits the inference, which I draw, and the finding, which I make, that neither plaintiff nor his counsel would have objected to one.
14. Utica considered a further IME of plaintiff on several occasions, but rejected the idea. The evidence permits the inference, which I draw, and the finding, which I make, that Utica reached this decision because it believed the results of the IME would be more likely to harm Utica’s interests than to help them.
15. On September 20, 1991, Mr. Greenberg sent Utica a written settlement demand of $200,000.00, together with additional medical records confirming medical information which Utica had previously received, viz., L-l radiculopathy, lumbar disc herniation, post-traumatic headaches, and bilateral lumbosacral root compressions, all resulting from the accident. Mr. Greenberg pointed out that plaintiff was still unemployed as a result of the accident.
16. Upon receiving the demand and medical package, Zeidman requested additional medical records concerning plaintiffs treatment for back injuries sustained in 1977. On October 1, 1991, Greenberg responded by providing the records for the period 1978-1983.
17. Utica made no settlement offer in 1991.
*279 18. In November 1991, Zeidman retained William B. (“Sam”) Gaughan to perform another activily check. Using false pretenses, Gaughan contacted plaintiff twice in November 1991, and confirmed that plaintiff was not working. Gaughan’s contacts with plaintiff were improper and violated Utica’s standards. Furthermore, Zeidman had not informed Gaughan that plaintiff was represented by an attorney.
19. On January 23, 1992, Mr. Greenberg made another written settlement proposal, this one for $750,000, including demands for relief under G.L.c. 93A and G.L.c. 176D. His proposal described plaintiffs injuries in detail, made appropriate statutory references (specifically noting the consequences of failure to respond within 30 days), and supplied additional documentary medical confirmation of plaintiffs injuries and damages: physical therapy notes, physician’s office notes, CT scans of the lumbar spine, a myelogram report on the lumbar spine, an MRI report on the cervical spine, photographs of the head injury, police reports and the defendant’s citation. The proposal documented the $37,544 wage loss with plaintiffs 1990 Form 1040 and W-2s from 1990.
20. The $750,000.00 demand was objectively reasonable.
21. Upon receiving the January 23, 1992 communication, Utica assigned the response to John Ryan, Esq. of Boston, a highly reputable attorney well versed in insurance-law matters. Neither Mr. Ryan nor Utica sought any further information from Mr. Green-berg before Mr. Ryan responded to Mr. Greenberg’s letter of January 23, 1992, which he did February 20, 1992.
22. Mr. Ryan’s response contained no settlement offer. Instead he asserted that Utica could not respond to the demand: he also maintained that Utica had violated neither G.L.c. 176D nor G.L.c. 93A. Mr. Ryan maintained that Mr. Greenberg had failed to provide information Utica had requested concerning a back injury which plaintiff had sustained in the 1970s. He did not suggest that Mr. Greenberg’s letter was insufficient in any other respect.
23. The only medical information Mr. Ryan requested was that which Mr. Greenberg had previously supplied in October 1991.
24. On February 24, 1992, Mr. Greenberg sent Mr. Ryan, for his consideration and review, a copy (with enclosures) of his previous letter to Zeidman.
25. Neither Mr. Ryan nor Utica asked Mr. Greenberg for additional information regarding the previous back treatment. Nor did either suggest that the information supplied was incomplete or inadequate for their purposes.
26. Utica gave plaintiffs medical records to a neurologist, Dr. Thomas Sciascia, for review. After receiving Dr. Sciascia’s response, Zeidman noted (Exhibit 13, March 24, 1992): “The bad news is that the doctor says that the injury sustained by the claimant on [sic] our accident of neck cervical disc herniation and the post-traumatic syndrome would appear to be from our accident. He sees nothing in the claimant’s prior history to [sic] show any of these injuries.”
27. Zeidman did not request additional medical information from Mr. Greenberg until April 3, 1992, at which time Mr. Greenberg was, in Zeidman’s words “very cooperative,” and promised to provide the information promptly. Zeidman sent Mr. Greenberg his request list in a letter dated April 14, 1992, but apparently not posted until April 27.
28. On April 21, 1992, Mr. Greenberg sent Zeidman more medical information, including the report of Dr. David A. Roth, a microneurosurgeon. Dr. Roth opined that plaintiff had a cervical strain with disc protrusion, and described plaintiffs pain as radiating from the posterior cervical area into the right shoulder and down the right arm to the elbow and hand. Dr. Roth found plaintiff to have limited cervical range of motion, marked tenderness of the right shoulder, and extreme limitation of motion in abduction, internal and external rotation. Dr. Roth concluded that plaintiff appeared to have a right shoulder injury, involving the joint or the rotator cuff.
29. That same day, April 21, 1992, Mr. Greenberg also forwarded medical records from the Health Stop relating to plaintiffs pre-accident care and treatment. These showed plaintiff to have been without disability from early 1987 to May 4, 1991.
30. On May 12, 1992, Mr. Greenberg sent Zeidman all remaining medical information requested in Zeidman’s letter of April 14, 1992. On May 28, 1992, Zeidman, noted that he had “received the balance of the med reports requested . . .” see Exhibit 13.
31. On May 20, 1992, Mr. Greenberg sent Utica the report of a neuropsychological report performed by Philip A. Morse, Ph.D., indicating that plaintiff had never previously consulted a psychologist, and had no previous psychiatric history.
In summary [Dr. Morse wrote], the patient exhibits significant cognitive and emotional problems that have occurred since his motor vehicle accident. They are consistent with a diagnosis of postconcussive syndrome or mild traumatic brain injury. These areas of cognitive and emotional difficulty affect functional living skills and his ability to carry out successfully the day-to-day activities that he is attempting to do at home. They also significantly affect his ability to return to work in the kind of job that he previously was employed in, not just for physical reasons but for cognitive and emotional reasons as well.
32. Having reviewed all the medical records Mr. Greenberg sent, Dr. Sciascia concluded (and reported to Utica) that plaintiff had suffered neck, shoulder, *280 head, and lumbar spine injuries and laceration of the head, all related to the accident of May 4, 1991, although the lumbar spine injury was an exacerbation of a previous injury. Dr. Sciascia also noted that plaintiff had worked from 1983 to 1991 without treatment for his back injury, and that “it is unclear whether he had been seeking treatment from the VA Hospital system in the past. I think that it may be useful to obtain VA medical records to document any preexisting musculoskeletal or headache complaints.”
33. The evidence permits the inference, which I draw, and the finding, which I make, that by June of 1992, Utica knew or should have known that plaintiff was permanently and totally disabled from work.
34. On June 12, 1992, Zeidman wrote Mr. Green-berg requesting still more medical records: Dr. Ballantine’s office notes; information about medical treatment for anemia and black-out problems; and VA records (the latter because “we find that your client was treated at the VA Hospital, per his Vietnam duty”).
35. None of plaintiffs medical or work records indicated that plaintiff had ever been treated at a VA hospital.
36. On June 17, 1992, Petrosius and Vincent Flewelling, Utica’s regional claims manager, discussed plaintiffs case with Katherine Lewis, a claims examiner at Utica’s home office. They jointly recommended raising the reserve (the probable amount Utica would have to pay) to the policy limits: $250,000.00. They also recommended authorizing them to settle the claim for $250,000.
37. On June 19, 1992, the home office accepted both recommendations.
38. On July 3, 1992, Zeidman proposed to Mr. Greenberg a series of structured settlements, each with a present value of less than $175,000.
39. Plaintiff through counsel rejected the offer. I find the rejection to have been reasonable and justified, given the exposure and the likelihood of plaintiffs success.
40.1 find that under the circumstances Utica’s offer was unrealistic, unreasonable, and unjustified. In making this finding, I have in mind that Zeidman had authority to offer $250,000; that the exposure considerably exceeded this amount; that Zeidman and all other Utica employees involved in the matter knew, or should have known, that until Utica tendered its policy limit, the excess coverage which was available could not be applied to pay the claim.
41.Utica made no further offer of settlement until May 4, 1994, at the mediation of the case. I find this conduct unrealistic, unreasonable and unjustified. In making this finding, I have in mind that Zeidman had authority to offer $250,000; that the exposure considerably exceeded this amount; that Zeidman and all other Utica employees involved in the matter knew, or should have known, that until Utica tendered its policy limit, the excess coverage which was available could not be applied to pay the claim.
42. On October 22, 1992, Mr. Greenberg furnished Utica additional documentation of plaintiffs damages: the report of Arthur J. O’Shea, Ph.D., a psychologist specializing in vocational consultation, stating that plaintiff, lacking transferable skills, was unemployable.
43. Utica neither submitted Dr. O’Shea’s report to an expert for review nor sought plaintiffs further examination.
44. The evidence permits the inference, which I draw, and the finding, which I make, that no later than October 22, 1992, Utica decided to force plaintiff to commence suit, hoping that the litigation would turn up some information which Utica could use to obtain a more advantageous settlement. The evidence permits the additional inference, which I draw, and the further finding, which I make, that this strategy was in no respect reasonable.
45. In December 1992, Utica retained Nationwide Insurance Investigators, Inc. to conduct another activity check on plaintiff, but again did not inform the investigators that plaintiff was represented by counsel.
46. In January, 1993, without identifying himself, the Nationwide investigator went on plaintiffs New Hampshire property and engaged plaintiffs wife in conversation.
47. The instant action was commenced in early February 1993. Utica assigned defense of the negligence claims to Thomas Murphy, Esq. Defense of the c. 93A case remained with Mr. Ryan.
48. Within a few months, Mr. Murphy, having surveyed all Massachusetts VA hospitals, determined that plaintiff had never been treated at any of them. He obtained a court order authorizing access to plaintiffs VA records for the preceding five years, but his requests to 11 VA hospitals produced nothing.
49. Although Utica had expressed need for Dr. Ballantine’s office notes to evaluate the claim, neither Mr. Ryan nor Mr. Murphy ever attempted to obtain them.
50. In June 1993, Mr. Greenberg notified Mr. Ryan that plaintiff was receiving Social Security Disability payments, and that he had been adjudicated permanently and totally disabled as a result of his May 1991, accident. Not until February 1994 (eightmonths later) did Utica request any further information on the matter.
51. In August 1993, without plaintiffs authorization, Utica attempted to contact plaintiffs emergency room nurses at the Winchester Hospital. In fact, Zeidman visited the hospital to interview nurse Barbara Callahan.
*281 52. In June 1993, Mr. Murphy determined the probable value of the case to be over $250,000.
53. In September 1993, Mr. Murphy sent Zeidman a written evaluation of the case which recommended that, because liability was clear, and damages potentially “astronomical,” Utica offer the full policy amount ($250,000) in settlement. Mr. Murphy made similar suggestions to both Zeidman and Petrosius in September 1993, and again in November 1993.
54. Although Mr. Murphy conducted extensive discovery in an attempt to establish a lack of liability or diminished liability on the part of Butler (Utica’s assured), he never developed any such evidence.
55. At a mediation on May 4, 1994, Utica offered its policy limits. Subsequently, Merrimack Mutual Insurance Company (“Merrimack”), the “excess” carrier, offered additional settlement funds. Within a few days, the matter was settled for $675,000.00.
56. Merrimack had set its initial reserve figure at $20,000 in 1992, based primarily on Merrimack’s understanding that Utica did not intend to offer the full limits of its policy, and that the Merrimack file would therefore require little activity.
57. Both Utica and Mr. Greenberg kept Merrimack informed of developments in the case, and sent all relevant medical and other records to Merrimack’s claims examiner or its outside adjuster.
58. In February 1994, with trial scheduled for June • 1994, Merrimack raised its reserves to $600,000 because Merrimack believed that Utica was likely to offer its policy limits.
59. Most of the medical information Merrimack relied upon had been supplied prior to June 1992. Merrimack did not have plaintiffs Social Security Administration file when it raised the reserves, although it did have the opinion of the Administrative Law Judge who had decided plaintiffs disability case. The only additional items underlying the decision to raise the reserves which the Merrimack file did not contain before June 1992, were: Dr. O’Shea’s report; a summary of plaintiffs deposition; an indication that plaintiff was on Social Security disability; and information that plaintiff would receive inpatient treatment for his continuing pain problems at Spaulding Rehabilitation Hospital.
60. After May 1992, no one suggested a medical diagnosis for plaintiff different from previous diagnoses. By May 1992, his injuries were all well defined and well described.
61. The evidence permits the inference, which I draw, and the finding, which I make, that had Utica offered its policy limits in late 1992, Merrimack would have made an offer at least equivalent to that which it made in May 1994 ($425,000), and which plaintiff accepted.
CONCLUSIONS OF LAW
1. Utica was required, G.L.c. 176D, §3(9)(f) to effectuate prompt, fair and equitable settlement of any claim in which liability had become reasonably clear.
2. In plaintiffs claim against Butler, liability was always reasonably clear.
3. Attorney Marvin Greenberg’s letter of January 23, 1992, properly set forth demands for relief pursuant to G.L.c. 93A, §§3 and 9, and G.L.c. 176D, §3(9)(f).
4. Mr. Greenberg’s $750,000 demand was reasonable and statutorily appropriate, Cassano v. Gogos, 20 Mass.App.Ct. 348, 350-53 (1985).
5. Utica was required to make a reasonable offer of settlement within thirty days of the demand made upon it, G.L.c. 93A, §9(3). Utica’s failure to make an offer of settlement until July 3, 1992, violated the statute. Slaney v. Westwood Auto, Inc., 366 Mass. 688, 704-05 (1975).
6. Utica’s response to the January 23, 1992 demand letter was inadequate, constituted statutory unfairness and deception.
7. By January 23, 1992, Utica possessed sufficiently adequate documentation to warrant its offering $250,000, i.e., its policy’s limits. By failing to do so within 30 days (on or before February 23, 1992) Utica violated G.L.c. 93A, §9, and G.L.c. 176D, §3(9)(f).
8. Having received from Mr. Greenberg In May, June, and October 1992 additional medical records and reports further substantiating plaintiffs damages in excess of the $250,000 policy limits, Utica continually violated G.L.c. 93A, §9 and G.L.c. 176D, §3(9) (f) by failing to offer the full limits of its policy at any time in 1992.
9. Utica’s July 1993 offer of approximately $175,000, was unreasonably low. Utica, having the burden of demonstrating that it made a reasonable offer of settlement, Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 799 (1976), see also, Calimlim v. Foreign Car Center, Inc., 392 Mass. 228, 234 (1984), has failed to do so.
10. Utica, neither needing nor reasonably attempting to obtain additional medical information, instead provoked unnecessary litigation in the faint hope of discovering damaging information it could not reasonably believe existed. This was not even a case like Wallace v. American Manufacturers Mutual Insurance Co., 22 Mass.App.Ct. 938, 939 (1986) (rescript), where the insurer had “ ‘every right to be suspicious’ but ... ‘it never reached the point where its questions were any more than suspicions.' ” Here, Utica pushed suspicion beyond even paranoia, and certainly over the brink of fair practice.
11. Utica acted unfairly and deceptively when it attempted to contact nurses at the Winchester Hospital, thus unreasonably and improperly invading *282 plaintiffs privacy, G.L.c. 214, §1B. The privacy right includes the confidentiality of medical records and medical treatment, see Tower v. Hirschhorn, 397 Mass. 581, 586 (1986); see also, Bratt v. International Business Machines Corp., 392 Mass. 508, 522-23 (1984).
12. Utica acted unfairly and deceptively when its investigators contacted plaintiff and his wife after Utica knew them to be represented by counsel.
13. Because in 1993, Utica received, among other information: further confirmation that its insured was wholly liable for the accident; the opinion of its counsel that the damages could be “astronomical” and would likely exceed the policy limits; and information that plaintiff was receiving Social Security disability payments, Utica’s continuing refusal to tender its policy limits violated G.L.c. 93A, §9 and G.L.c. 176D, §3(9)(f).
14. These violations continued until May 4, 1994, when Utica finally tendered its policy limits.
15. Utica’s failure to tender its policy limits caused plaintiff to sustain loss of use of $250,000 from February 1992 to June 1994. It is likely that had Utica tendered the policy limits earlier, the excess carrier would have settled sooner; however, I cannot determine fairly when such settlement would have occurred. Thus I am not able to award damages for the loss of use of the rest of the settlement package.
16. Pursuant to Acts, 1989, c. 580 plaintiff is entitled to entry of judgment in the amount of $250,000, and multiple damages upon that sum.
17. The failure of Utica to settle plaintiffs matter on or about February 1992, and the failure to make any offer until July 1993, was under the circumstances as detailed in the Findings of Fact, supra, a grossly willful and knowing violation of G.L.c. 93A, §2 and 9.
18. Plaintiff is entitled to treble damages for Utica’s knowing and willful failure to effectuate a prompt and equitable settlement of his claim.
19. Plaintiff is entitled to reasonable attorneys fees and costs pursuant to G.L.c. 93A, §9(4).
ORDER
Accordingly, it is Ordered, the Judgment enter forthwith as follows;
Judgment for Plaintiff for $250,000, trebled, plus interest and costs, and an attorneys fee in the amount of $150,000.